# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

PETER CABRERA,

        Petitioner,

    v.

JEFF MACOMBER,

        Respondent.

Case No. 1:15-cv-01547-LJO-EPG-HC

FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Peter Cabrera is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, Petitioner raises the following claims for relief: (1) erroneous limitation of release of juror information; (2) erroneous denial of motion for new trial; (3) ineffective assistance of counsel; and (4) erroneous and coercive reasonable doubt instruction.

For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

On September 25, 2008, Petitioner was convicted by a jury in the Fresno County Superior Court of attempted second-degree robbery. The jury also found true that Petitioner intentionally discharged a firearm causing great bodily injury and personally inflicted great bodily injury.

1

(CT[1] 212, 214). Petitioner was sentenced to an imprisonment term of two years on the attempted robbery count, a consecutive term of three years for the great bodily injury enhancement, and twenty-five years to life for the firearm enhancement. (CT 263, 265). On May 10, 2011, the California Court of Appeal, Fifth Appellate District "conditionally reversed" the judgment and remanded the matter for further inquiry into alleged juror misconduct. People v. Cabrera (Cabrera I), No. F057254, 2011 WL 1782088, at *24 (Cal. Ct. App. May 10, 2011). On July 20, 2011, the California Supreme Court denied the petition for review. (LDs[2] 13, 14).

On February 3, 2012, the Fresno County Superior Court denied Petitioner's motion for a new trial. (Corr. CT[3] 122; 7 RT[4] 1023, 1027–28). On July 30, 2014, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Cabrera (Cabrera II), No. F064340, 2014 WL 3738660, at *9 (Cal. Ct. App. July 30, 2014). On October 15, 2014, the California Supreme Court denied the petition for review. (LDs 32, 33).

On October 13, 2015, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 19, 24).

## II.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY[5]

***Testimony of Jorge Rodriguez***
Just before midnight on October 20, 2007, Jorge Humberto Rodriguez Hernandez (Rodriguez) was working on a food truck parked adjacent to a car wash at First Street and McKinley Avenue in Fresno. His duties included taking orders and acting as cashier. Bobby Hauter and two friends walked to the truck to place an order. Two people approached Hauter, said they were going to rob the food truck, and told him to leave. They said, "You gotta go, doggie. We're gonna rob the taco truck." One of the men had a "furry hood" attached to a knee-length sweater or jacket. Hauter left the area of the food truck and called 911.

Rodriguez said two people arrived near the door of the truck and demanded money from the cash box. When Rodriguez told the pair there was no money, one

[1] "CT" refers to the Clerk's Transcript on Appeal lodged as Document No. 1 by Respondent on March 21, 2016. (ECF No. 20).
[2] "LD" refers to the documents lodged by Respondent on March 21, 2016. (ECF No. 20).
[3] "Corr. CT" refers to the Corrected Clerk's Transcript on Appeal lodged as Document No. 17 by Respondent on March 21, 2016. (ECF No. 20).
[4] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on March 21, 2016. (ECF No. 20).
[5] The Court relies on the California Court of Appeal's May 10, 2011 and July 30, 2014 opinions for this summary of the facts and procedural history. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

of them brandished a small "gold color" gun. Rodriguez identified appellant as the individual with the gun. Rodriguez said the person with the gun was dressed in a black sweater similar to a hooded sweatshirt. The individual wore black glasses. Rodriguez could not see the individual's hair color but did say he had goatee-like facial hair. Nevertheless, Rodriguez identified appellant as the person who tried to rob him.

After Rodriguez told the assailant there was no money, the individual hit the register with his right hand. Rodriguez tried to move the individual's hand but the individual did so on his own. Rodriguez said he refused the individual any money. The assailant then "started getting like nervous" and fired the weapon, wounding Rodriguez's groin area. A police officer and an ambulance arrived a few minutes later. Rodriguez was hospitalized and underwent surgeries for injury to his testicles and to his bladder. Rodriguez said the individual ran away without getting any money.

### Testimony of Belen Melendrez
Belen Melendrez testified she was working with her boyfriend, Rodriguez, at the El Premio Mayor taco trailer at McKinley and Normal Avenues just before midnight on October 20, 2007. She heard someone loudly ask for money and assumed it was a customer wanting change. Melendrez was at the grill and turned around and approached the door of the trailer when she heard the person say, "Give me the f* *king money." Melendrez saw that the man was holding a small, shiny gun. At trial, she identified appellant as the man with the gun and said he had been dressed in a dark hooded sweater. He wore dark glasses and had a "shaven, but noticeable" beard. The hood was on and it covered appellant's hair. Melendrez said appellant reached in toward the register. Rodriguez said there was no money in the register and tried to grab the weapon. Appellant fired, Rodriguez hunched over a little bit, and then Rodriguez fell outside the trailer.

### Testimony of Officer Catton
Later that morning, Fresno Police Officer Gregory Catton conducted an "in-field showup" involving a suspect. The showup took place on East Mayfair Avenue. Four police officers and appellant were present at the showup. Catton said he read an "admonishment" from a card. After Catton did so, Bobby Hauter identified appellant as one of the men he had seen at the food truck. During the showup, Hauter told Catton that appellant was wearing black sunglasses and a black coat during the incident.

### Testimony of Officer Depew
Fresno Police Officer Steven Depew testified he was on duty on the evening of the offense and received a broadcast about a shooting and robbery at a taco truck. Officer Depew and his partner, Officer Bryan Williams, also received word the suspect had fled on foot. Depew and Williams began to circulate in the area of the offense and found appellant using a cellular telephone while standing in the driveway of his residence on Mayfair Drive South. The dispatcher had also provided a description of the suspect, and Depew said appellant matched the physical characteristics of the suspect. Depew stood by appellant at the curb while other officers conducted an in-field showup. Officer Williams said appellant was dressed in a black shirt, black pants, dark shoes, and a dark blue jacket during the time of the showup.

### Testimony of Officer Hoover
Fresno Police Officer Jason Hoover testified he was on patrol duty on the date of the offense and heard the dispatch broadcast of the incident. According to Officer

Hoover, the dispatcher described the suspects as "two Hispanic males one of them 25 to 30 years of age wearing dark sunglasses. The other subject was almost the same description, wearing I believe a beanie with dark clothing." According to Hoover, the dispatcher said the beanie was red and the dark clothing consisted of a dark-hooded sweatshirt with fur around the hood. Hoover further explained that the younger suspect was described as 25 to 26 years of age, wearing all black clothing and dark sunglasses, had a light complexion, and was armed with a silver handgun.

### Stipulation of the Parties

On September 19, 2008, the court read the following stipulation to the jury:

> "The People and the Defendant hereby agree to the following stipulation: (A), Jorge Rodriguez received severe injuries as a result from [*sic*] a gunshot wound on October 20th, 2007. Those injuries are as follows: (1), a gunshot wound to the penis and groin. (2), This wound caused Jorge Rodriguez to undergo several surgeries to the penis, testicles, bladder and other parts of the groin area. (3), To this day Jorge Rodriguez still feels some pain and discomfort, but is now fully functional again. (b), Those injuries constitute a great bodily injury as defined in both Penal Code Section 12022.7 and Penal Code Section 12022.53 subdivision (d). (C), The jury is to consider all elements met as they relate to great bodily injury and are to consider them true."

### Defense Evidence

### Testimony of Officer Phebus

Fresno Police Officer Steve Phebus testified he interviewed Jorge Rodriguez through a Spanish language translator at Community Regional Medical Center Emergency Room on October 21, 2007. Rodriguez said the individual had no facial hair, was clean shaven, was approximately 25 or 26 years of age, and wore a "sweater hat" and big, black sunglasses.

### Testimony of Identification Technician Wilson

Spring Wilson testified she was an identification technician with the Fresno Police Department at the time of the offense. She said an officer collected the suspect's clothing in the prisoner processing area and she logged the items into evidence. The items included a black T-shirt, black wool or flannel-type pants, and blue zippered hoodless sweatshirt.

### Testimony of Rosalinda Rivera

Appellant's longtime acquaintance, Rosalinda Rivera, testified she spoke with appellant throughout October 20, 2007. At around 5:00 p.m. she asked appellant whether he wanted to attend a family party with her. Appellant said he did and Rivera picked him up around 6:00 p.m. at his mother's home in the vicinity of First Street and McKinley Avenue. Rivera's two-year old son was in the car when she picked up appellant. They next picked up someone named "Evie" and the four of them attended "a little cousin's birthday party." They left the party sometime between 10:00 and 10:30 p.m., went to a gas station for fuel, and then went to Rivera's apartment on Calaveras Street and Divisadero Avenue at about 11:15 p.m. Rivera offered to drive appellant home but appellant said he would walk home. Rivera said appellant walked away talking on his cell phone. He departed no later than 11:30 p.m. Appellant was dressed in a navy blue collared sweater and black pants.

4

### Testimony of Elvia "Evie" Gomez
Elvia "Evie" Gomez testified she was a childhood friend of appellant. On October 20, 2007, she accompanied appellant, Rivera, and Rivera's son to "a little kid's birthday party." After the party, they returned to Rivera's apartment. She saw appellant depart sometime between 11:00 and 11:30 p.m. and he was walking and talking on his cell phone. Gomez remembered speaking with a police investigator approximately two months after the offense. She told the investigator that appellant had been wearing, black shoes, black pants, a blue shirt, and a dark-colored hooded sweatshirt on the evening in question.

### Testimony of Daniel Hernandez
Daniel Hernandez testified he had known appellant for approximately 10 years. Hernandez, a senior information technology consultant at California State University, Fresno, testified he also served as a private consultant and that appellant worked as his apprentice. Hernandez said he supplied a cell phone to appellant for work purposes and paid for appellant's cell phone service. Hernandez said he and his clients made calls to appellant on the cell phone. Hernandez also acknowledged that appellant used the phone for personal use. Appellant did use the phone on the evening of October 20, 2007, and the phone bill reflected a collect call from a party whose identity was known to Hernandez.

### Testimony of Forensic Scientist Kaminski
Laurie Kaminski testified that she worked as a forensic scientist for Forensic Analytical Sciences, a private crime laboratory in Hayward, California. Her duties include gunshot residue testing. Kaminski testified she received a gunshot residue kit from the Fresno Police Department with respect to appellant. Kaminski used a scanning electron microscope to examine the kit but did not detect any particles indicative of gunshot residue. Kaminski explained, "The time delay is a factor. Gunshot residue particles are lost over time and they are lost due to hand activity or someone washing their hands." When further examined about negative results from GSR tests, Kaminski added, "[S]omeone could have fired a gun and lost the particles due to hand activity or the gun wasn't producing a large amount of residue or somebody could have not fired a gun and gotten a negative result...."

### Further Testimony of Elvia "Evie" Gomez
Upon examination as a defense witness, Elvia "Evie" Gomez testified appellant wore a dark shirt on the evening of the offenses, but she could not remember whether it was blue or black. On cross-examination, she acknowledged telling an investigator in December 2007 that appellant's shirt was blue. On redirect examination, Gomez said she could have been wrong when she spoke with the defense investigator. She did not remember appellant having anything on his head on the evening in question.

### Testimony of Dr. Shomer
Robert Shomer, Ph.D., a psychologist, testified "[t]he baseline of accuracy in eyewitness identification is very low, so it doesn't start off very high. The things that reduce it very significantly are sudden unexpected stressful events where weapons are present or there may be more than one perpetrator of the crime and where the entire face or the appearance of the perpetrator cannot be seen...." Dr. Shomer also testified that "field showups" involving one suspect are inherently suggestive and that the best method for identification is a multiple set of live individuals "called a live lineup." Dr. Shomer acknowledged that there may be many factors in a particular situation that may make an accurate report and identification doubtful. On cross-examination, Dr. Shomer admitted he could not

testify as to how these factors affected the perception of the witnesses in appellant's case. Shomer explained, "That's for the jury to determine."

### Rebuttal Testimony

Defense investigator Alberto Custodio testified he interviewed Elvia "Evie" Gomez on December 6, 2007. Gomez said appellant was wearing black shoes, black pants, a blue shirt, and a dark-colored hooded sweater on the evening of October 20, 2007.

### Facts Underlying the Allegations of Juror Misconduct and Appellant's New Trial Motion

On the afternoon of September 23, 2008, the jury began the deliberations. At 4:30 p.m., the jury requested to hear certain testimony. On the morning of September 24, the court responded to the jury's first inquiry. At 11:10 a.m., the jury asked to hear additional testimony.

At 3:10 p.m. on September 24, the jury asked to directly address the court. The foreperson stated the jury needed "some guidance." The court determined the jury was unable to reach a unanimous verdict on count one and that four ballots had been taken. The court asked the foreperson if there was "any movement," and the foreperson said there was. The court asked if it could assist the jury with some further legal instruction or testimony. The jurors privately conferred, and the foreperson asked the court to explain the definition of reasonable doubt because "a couple of jurors are having a little difficulty understanding that exactly." The court reinstructed the jury on reasonable doubt. Thereafter, the jury resumed deliberations. Later that afternoon, the court adjourned the deliberations for the day.

On the morning of September 25, 2008, the jury returned verdicts finding appellant guilty of second degree robbery (Pen.Code, §§ 211, 664) and finding it true that he intentionally discharged a firearm causing great bodily injury to Jorge Rodriguez (Pen.Code, § 12022.53, subd. (d)) and finding that he personally inflicted great bodily injury upon Rodriguez (Pen.Code, § 12022.7, subd. (a)). The court polled the jury and each signified the verdict of guilt and the findings on the special allegations constituted their "true, correct, personal, and unanimous verdicts."[6]

After the court polled the jury, the court asked counsel, "Is there any legal cause why I should not discharge this jury at this time?" Both counsel responded in the negative. The court then instructed the jury:

> "You have now completed your jury service in this case. On behalf of all the judges of the Fresno County Superior Court, everybody here in this courtroom, I want to thank you very much for your effort, your time, and your consideration of the case.

---

[6] "[Penal Code] [s]ections 1163 [polling jury] and 1164 [recording verdict in minutes] describe a culminating formal procedure for verifying the unanimity of the jury in open court, and thus they define the moment of transition for when a juror may and may not withdraw his or her affirmation of the verdict. Before the verdict is complete within the meaning of these sections, a juror's expressions of doubt or confusion mandate further deliberations. After the passing of this moment, such expressions are an impermissible attempt to impeach the verdict. In this respect, [Penal Code] sections 1163 and 1164 define the final moment of the jury's deliberative process." (*People v. Bento* (1998) 65 Cal.App.4th 179, 191.)

6

"Now that the case is over, you may choose whether or not to discuss the case and your deliberations with anyone. Let me tell you some things about the rules the law puts in place for your convenience and your protection. The lawyers in this case or their representatives may now talk to you about the case, including your deliberations, your verdict, and findings. Those discussions must occur at a reasonable time and place, and only with your consent. Please immediately report to this court any unreasonable contact made without your consent. And any lawyer or representative who violates the rules of professional conduct and the standing orders of this court regarding such conduct will be in violation of this court's order and subject to sanction.

"I hereby order that the court's record of personal juror identification information, including names, addresses, and telephone numbers shall be sealed until further order of the court. And if in the future this court is asked to decide whether this information will be released, notice will be given to any juror whose information is involved and such juror may oppose the release of this information and ask that any hearing on the release of information shall be closed to the public, and this court will decide whether and under what conditions any information may be disclosed."

The court then excused and discharged the jury. At 4:15 p.m. that same day, a trial juror e-mailed Judge John F. Vogt, who presided at the trial, and stated:

"I voted incorrectly and against my own good judgment in the case trial People vs. Peter Cabrera in your courtroom today.

"I am the juror who was holding up the verdict the last two days because it had not been proven to me with the evidence presented that Peter Cabrera was guilty 'beyond all reasonable doubt.'

"This morning, Thursday, September 25th we began jury deliberations once again at approximately 9 am. My fellow jurors became instantly enraged when it became apparent I still did not believe Peter Cabrera was guilty *beyond all reasonable doubt*. Due to the very angry and what I considered hostile pressure from the other jurors (among other things going on in the deliberation room aimed at me due to my 'Not Guilty' voting) I 'broke' and voted 'guilty'.

"In addition to the hostile/angry environment I was in among the jurors, I believe I was not thinking clearly and not able to stand the pressure to having received bad news regarding my mother[']s health at 8:30 pm last night (though I tried to and thought I was keeping my mind on the trial). After leaving the courthouse and having some time to think without the other jurors attacking me (ie, hostility based slurs, comments and physical movements/gestures by other jurors) I realized I had made an absolute mistake in how I voted.

"I apologize for the obvious problems I am about to cause by writing this—but I have to do 'the right thing' and I apologize for

letting hostile fellow jurors and outside sources interfere with my vote before the verdict was reached, given and read. With all the evidence presented to me—I clearly believe Peter Cabrera is not guilty of what he is charge with." (Italics in original.)

On January 8, 2009, appellant filed a petition for order disclosing personal juror information. In a supporting declaration, appellant's trial counsel stated:

"[¶] ... [¶]

"3. I am informed and believe, and on that basis, declare that the court is in possession of a letter written to the court by a juror in this case. In the letter, this juror described that she believed that the defendant was innocent, but that she was pressured by other juror(s) to the point that her will was overcome[.]

"4. Based on this letter and its contents, I am further informed and believe, and thereon alleged, that there exists sufficient cause to believe that juror misconduct may have occurred to the prejudice of the defendant, and that further research and investigation is warranted to confirm that juror misconduct occurred sufficient to act as a reasonable basis to a motion for new trial.

"5. In order to protect the privacy and sanctity of the jurors and given the above facts, I have made no other attempts to contact the jurors.

"6. Except through this petition, I have no way of determining the names, addresses, and phone numbers to research and investigate the reason(s) this juror felt compelled to write the court to express that she believed the defendant was not guilty notwithstanding the guilty verdict.

"7. Further investigation and research is necessary to verify and develop facts in order to present the court with adequate information upon which to rule on a motion for new trial."

Defense counsel also filed a motion for new trial (Pen.Code, § 1181, subd. 6) on the ground of insufficiency of the evidence.

On January 22, 2009, the People filed written opposition to the motion for new trial and written opposition to the defense petition for order disclosing personal juror information. In the written opposition to the petition, the People asserted appellant did not make a prima facie showing of good cause for disclosure, that the e-mailed letter to Judge Vogt set forth subjective beliefs and was inadmissible under Evidence Code section 1150, and that the facts set forth in the letter did not establish misconduct. The district attorney specifically stated in the written opposition to the petition:

"Section 237(b) states that before any petition may be granted, the defense must provide a declaration showing good cause. The defendant claims that the court should provide for the personal juror information based upon a letter the Court received following trial from a juror. The defendant claims that based on this letter, Good Cause exists because this would be proof of juror

misconduct and would be grounds for a new trial. This letter is not admissible, does not show juror misconduct, and does not provide grounds for a new trial. This letter shows that a properly polled member of the jury has had a case of 'buyer's remorse.' "

On January 30, 2009, the court heard the arguments of counsel and denied the motion to disclose juror information, stating in relevant part:

"Well, let me just say that as a judge these are moments that I hate to have to deal with. I take very seriously that the moment of truth after a verdict has been read is asking the jury one last time if it is in fact their true, correct, personal, and unanimous verdict and finding. I'm very deliberate about doing that. And I do that just because I don't want to deal with things like this. The things that are brought to my attention by way of this letter, however, no matter how disturbing the job becomes it is still ruled by law. And in evaluating requirements of Evidence Code 1150 ... I just don't find that there is a basis to go any further.

"Federal case law under 'Evidence,' Federal Rules of Evidence, 606 subdivision (b), is the federal counterpart to our Evidence Code 1150 sets forth very persuasive authority on the specific issue before us. And particularly the case of *United States versus Briggs,* cited at 291 F.3d 958, says that this rule of evidence clearly bars consideration of the declaration's allegation. The juror said she was subjected to pressure by other jurors. It bars such declaration as evidence of a juror being intimated. Other federal cases, particularly *United States versus Tallman* ... 952 F.2d 164, states that it's not correct to admit proof of contentiousness and conflict to impeach a verdict. *United States versus Norton,* 867 F.2d 1354, notes that alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the guilty verdict. That's also noted in *United States versus Decoud* ... which in fact is a Ninth Circuit case, 456 F.3d 996.

"As a matter of substantive law, the juror's mental processes leading to the verdict are not to be considered at this time. I believe that's included within 1150 and cited back to the definition of relevant evidence under Evidence Code 210. But it is also clear under another federal case that as a matter of policy, Evidence Code Section 1150 subdivision (a) excludes evidence of the subjective reasoning processes of jurors to impeach their verdicts. Such evidence is not material. It is not relevant evidence as defined in Evidence Code Section 210 nor as it is defined in the California Constitution Article I, section 28 subdivision (d). [¶] ... [¶]

"There are all kinds of forms of buyer's remorse and I, quite frankly, don't doubt that this particular juror had misgivings, but after the fact. And I'm satisfied with my inquiries and my personal review of each of those jurors' responses at the time that I polled them that when these verdicts were signed off on, when they were submitted to me by the foreperson, when they were read by Madam Clerk and when they were confirmed by my subsequent polling that everybody in that jury box was satisfied with their work.

"... I think to even start inquiring into what could possibly have triggered this letter, we would be unduly infringing upon the other people who participated in rendering these verdicts, questioning their motives, questioning their actions when they don't have any misgivings about it. They responded the same way this juror did.

"I don't like these situations. They disturb me. And I've looked at it not only from the objective standards of law that I believe clearly dictate the action that I need to take today, but I've looked at it from that very personal standpoint of what happened when I polled those people after the verdicts were read. I do that very deliberately. And I'm satisfied that these verdicts were rendered according to law, that this group of people diligently deliberated, searched their souls as individuals and reached a unanimous collective verdict and finding on each and every matter set forth."

Cabrera I, 2011 WL 1782088, at *1–8 (footnote in original).

**_Cabrera I_**
Defendant appealed the judgment, which we conditionally reversed in _Cabrera I_. (_Cabrera I, supra_, F057254.) We determined the trial court erred in summarily denying the request for disclosure of juror information. (_Ibid._) We remanded for the superior court to "set the matter for a hearing under Code of Civil Procedure section 237." (_Ibid._) We acknowledged the possibility defendant might thereafter file a motion for new trial, but expressly declined to address the merits of any such motion. (_Ibid._)

**Proceedings on Remand**

_September 30, 2011, Hearing_
On remand, defendant again petitioned the superior court for juror information under section 237. Defendant sought disclosure of all jurors' identifying information, not just that of the complaining juror. The basis for requesting disclosure was the complaining juror's e-mail which, "described hostility based slurs, comments and physical movements /gestures made by other jurors as well as other aggressions."

The superior court held a hearing on the petition to disclose juror information. At the hearing, the superior court said:

"Clearly, we need to give her notice of the hearing that we will conduct on whether we will release her information. The question is, who else do we involve in this? And after giving it considerable thought, my feeling is that not only do we need to hear from this particular juror, but I think we need to call upon the foreperson as well and give him or her ... notice of the fact that we would like to talk to him about this.

"I don't believe it's appropriate nor necessary to involve any other jurors, since we don't have anybody specifically identified. I think what we need to find out just from this particular juror what they claim happened and have the input of the foreperson to confirm, corroborate, dispute or whatever the issue would be. But my intention here is to take the first step, which I understand is the direction of the Court of Appeal and that is to send notice to these

affected jurors that there is going to be a request to release their information and conduct further investigation about the deliberations."

Shortly thereafter, the court stated:

"But my intention here is to get to the bottom of it directly, and that is to speak to this juror and to the foreperson. And if it involves further notices to be sent out, then that will have to be a separate step...."

In a similar vein, the court later said:

"And ... it seems to me to be an effective way to do it is to ... also try to get information from the foreperson. And if there is further disclosures, then we can go into the further possible affected jurors...."

*December 2, 2011, Hearing*

The court sent notice to the complaining juror and the foreperson pursuant to section 237, subdivision (c). The notice informed the jurors that their information would be released to counsel if they did not respond to the notice and did not attend the court hearing.

The complaining juror responded to the notice and consented to the release of her name and phone number to defense counsel and the trial judge only. The foreperson did not respond to the notice.

The superior court ordered the juror's personal identifying information be released to defense counsel and the prosecution. The court also told defense counsel the following:

"You have a specific time frame in which to file a motion for ultimate release. Now, procedurally, that does not bar you from filing a further petition under [section] 237 to seek release of other juror information. My prior ruling on your [section] 237 petition, and in light of the guidance provided by the Court of Appeal is to determine, first of all, you had made a prima facie case, but I made a determination at that time the affected jurors, for purposes of disclosure, would be the specific juror who registered the communication, and the foreperson, who would be responsible for monitoring and presiding over all the deliberations. There is no prima facie case based on the statement of the one particular juror that anybody else in particular was involved. Somebody was. The foreperson, I ruled, would be the person to contact about that information. So I can't give you advice on what to do here, here. What I'm saying is it doesn't bar you from intermediate steps. There is always another further [section] 237 petition that could be filed, if that is necessary, and I would need to make a determination under [section] 237 whether you have made a prima facie case for ... release of other juror information. If that is done, then obviously, it would have an effect on the timetables for other motions."

**Motions for New Trial**

On December 20, 2011, defendant filed a motion for new trial based on juror misconduct. On January 18, 2012, defendant filed a motion for new trial based on newly discovered evidence.

*Complaining Juror's Declaration*

In support of one of the motions for a new trial, defendant produced a declaration from the complaining juror.

The declaration described a male juror whose "demeanor" and "loud sighing noises he made as he paced back and forth" led the complaining juror to believe he was "upset with me." The male juror "threw his backpack and it landed right behind my chair, barely missing me." The complaining juror "felt this was a direct physical threat."

Additionally, the declaration recounted that the "foreperson told me that I could speak and then the rest of the jurors could tell me why I was wrong." The foreperson also allegedly said, "This [deliberations] [*sic*] needs to end now!" The declaration said, "I thought the foreperson was responsible for the mediation [*sic*], I remember this as part of what the judge instructed. Therefore, I assumed if there were any problems, such as this sort of threatening behavior, the foreperson would inform the judge."

When the complaining juror suggested the jury consider and discuss an expert's testimony, she was called a "defense whore" in a "loud and angry voice."

Another juror allegedly said, "They're all gang members and need to be put away in prison!" One juror said, "This has got to end because I have reservations in Pismo and would stand to lose a lot of money if I don't make this trip." Another juror said she had a hair appointment and could not miss it.

The complaining juror said, "I gave in and voted with the others, fearing what would happen to me ... emotionally and physically if I did not."

*Foreperson's Declaration*

The district attorney opposed the motion and produced a declaration from the jury foreperson. The foreperson declared he or she never witnessed any "conduct that could be perceived as a threat," throwing of any objects, or any other inappropriate activity. The foreperson also declared he or she never heard any verbal threats, derogatory comments about any witnesses, discussion of race, attempts by jurors to "close deliberations in order to leave due to other appointments or plans," or any other inappropriate statements.

The foreperson did recall that one juror wanted to leave "due to frustration." That juror "did not disrupt the deliberations," and the jury continued to deliberate thereafter.

The court denied both of defendant's motions for new trial. Defendant never filed a second section 237 petition seeking disclosure of additional jurors' identifying information.

Cabrera II, 2014 WL 3738660, at *3–5.

*///*

# III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court

decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Richter</u>, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. The Court looks to the last reasoned state court decision as the basis for the state court judgment. <u>See</u> <u>Brumfield v. Cain</u>, 135 S. Ct. 2269, 2276 (2015); <u>Johnson v. Williams</u>, 568 U.S. 289, 297 n.1 (2013); <u>Ylst v.</u>

Nunnemaker, 501 U.S. 797, 806 (1991). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

## IV.

## REVIEW OF CLAIMS

### A.  Release of Juror Information

In his first claim for relief, Petitioner asserts that the trial court abused its discretion in limiting the release of juror information to only two jurors and declining to notify the remaining jurors pursuant to California Code of Civil Procedure section 237. (ECF No. 1 at 5, 24; ECF No. 24 at 11).[7] Relatedly, in his second claim for relief, Petitioner asserts that the trial court "arbitrarily den[ied] Petitioner the basic tools of an adequate defense to meaningfully investigate jury misconduct" by limiting the release of juror information. (ECF No. 1 at 7, 25). Respondent argues that the state court's denial of these claims was not contrary to or an unreasonable application of any clearly established Supreme Court precedent. (ECF No. 19 at 27–28, 32).

Petitioner's claims regarding the release of juror information were raised on appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned opinion. The claims also were raised in the petition for review in the California Supreme Court,

---

[7] Page numbers refer to the ECF page numbers stamped at the top of the page.

which summarily denied the petition. (LDs 32, 33). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's claims regarding the release of juror information, the California Court of Appeal stated:

> Defendant claims the court abused its discretion in limiting the release of juror information to only two jurors. We disagree.
>
> ***Section 237***
> Generally, the personal identifying information of criminal trial jurors are sealed upon the recording of the verdict. (§ 237, subd. (a)(2).) However, any person may petition the court to release juror information. (§ 237, subd. (b).) The petition must be supported by a declaration "that includes facts sufficient to establish good cause for the release...." (§ 237, subd. (b).) If the petition and supporting declaration "establish a prima facie showing of good cause for the release" of juror information, then the court "shall set the matter for hearing" unless "there is a showing on the record of facts that establish a compelling interest against disclosure." (§ 237, subd. (b).)
>
> If the matter is set for hearing, the court must give notice to "each affected juror." (§ 237, subd. (c).) Any affected juror may protest the granting of the petition. (*Ibid.*)
>
> After the hearing, the court "shall" release the juror's information unless the court sustains the former juror's protest. (§ 237, subd. (d).) The court must sustain the juror's protest if (1) the petitioner fails to show good cause, (2) the record establishes a compelling interest against disclosure as defined by statute, or (3) the juror is unwilling to be contacted by petitioner. (*Ibid.*)
>
> ***Cabrera I Did Not Resolve the Issue Before Us***
> As a threshold matter, defendant argues that in *Cabrera I* we held that "a prima facie case had been shown" and therefore the superior court was required to notify all trial jurors under section 237. However, in *Cabrera I,* we only held that defendant had made a prima facie showing of good cause *as to the complaining juror.* Specifically, we held that defendant "satisfied his burden to obtain disclosure of the contact information *for the juror who sent the e-mail to the trial judge.*" (*Cabrera I, supra,* F057254, italics added.) We then immediately noted that, on remand, the superior court "*may* consider *whether* defendant has *also* satisfied his burden for disclosure of the contact information for other jurors in this case." (*Ibid.,* italics added.) Thus, *Cabrera I* expressly left open the question of whether defendant could satisfy his burden in triggering the release of other jurors' information.
>
> ***A Prima Facie Showing of Good Cause as to One Juror is Not Necessarily Sufficient to Trigger the Court's Duty to Notify All Other Jurors***
> We reject the contention that a trial must always notify all jurors when defendant demonstrates "good cause" to release one juror's information.
>
> In establishing the "good cause" requirement, section 237, subdivision (b) provides: "The petition shall be supported by a declaration that includes facts

sufficient to establish good cause for the release of *the juror*'s personal identifying information." (§ 237, subd. (b).) The use of the singular possessive "juror's" demonstrates that a trial court is not always required to notify *all* jurors merely because defendant satisfied his or her "good cause" burden as to *one* juror.

Additionally, section 237, subdivision (c)'s notice provision requires that "each *affected* former juror" be notified. (§ 237, subd. (c), italics added.) If a "good cause" showing as to one juror necessarily triggered a duty to notify all jurors, then the word "affected" would be superfluous in the statute. We avoid construing statutes in ways that render words superfluous. (*Klein v. United States of America* (2010) 50 Cal.4th 68, 80.)

***Defendant Never Showed Good Cause to Notify Jurors Under Section 237***
Next we address whether defendant made a showing of good cause as to the other 10 jurors.

Defendant's section 237 petition was based entirely on the complaining juror's e-mail.[8] The court ordered notice sent to the complaining juror and the jury foreperson. At the initial hearing, the court refused to order additional notices sent because no other jurors had been "specifically identified." The court described the notices as a "first step" in "get[ting] to the bottom" of the issue and specifically acknowledged that additional notices might need to be sent in the future. At the December 2, 2011, hearing, the court reiterated that defendant was not barred "from filing a further petition under [section] 237 to seek release of other juror information." In other words, the court was appropriately indicating that it would entertain a further petition based on information obtained from the complaining juror and/or the foreperson. The court said that if such a petition was filed, it would "need to make a determination under [section] 237 whether you have made a prima facie case for ... release of other juror information."

The court's approach was an eminently reasonable attempt to balance the jurors' rights to postverdict privacy and defendant's interest in obtaining information relevant to potential misconduct. By beginning the disclosure process as to the complaining juror and foreperson, the court was providing defendant the opportunity to explore allegations of misconduct. But, as the court noted, the complaining juror only specifically identified the foreperson as having acted improperly. There was no particularized showing as to any other specific jurors. And, the court noted that if information was uncovered implicating particular jurors in misconduct, it would entertain a further petition on the issue. Far from an abuse of discretion, the court's decision reflected a reasoned balance between the competing interests of defendant and the former jurors. We find no abuse of discretion.[9]

<u>Cabrera II</u>, 2014 WL 3738660, at *5–7 (footnotes in original).

---

[8] On appeal, defendant also relies on the complaining juror's *declaration,* which was filed after the court ruled on the section 237 petition. Defendant argues that even if the court's ruling on the petition were correct, it was an abuse of discretion to "fail to expand notification" given the "conflict" between their two declarations. But defendant never filed another section 237 petition requesting to "expand notification." To the extent defendant believed the complaining juror's declaration provided additional information supporting disclosure of other jurors' information, he should have accepted the court's initial invitation to file another petition. He did not do so.

[9] Nor do we find any constitutional violations. Defendant's claims the court's "error" also constituted a violation of his due process rights. We find no error and thus no constitutional violation.

1        1.  Limiting Release of Juror Information

2        Whether the trial court abused its discretion under California Code of Civil Procedure

3    section 237 in limiting the release of personal identifying information to two jurors and declining

4    to notify the remaining jurors is not cognizable in federal habeas proceedings. See Wilson v.

5    Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with *federal* law that

6    renders a State's criminal judgment susceptible to collateral attack in the federal courts.");

7    Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court

8    to reexamine state-court determinations on state-law questions."). Petitioner "may not . . .

9    transform a state-law issue into a federal one merely by asserting a violation of due process. We

10   accept a state court's interpretation of state law, and alleged errors in the application of state law

11   are not cognizable in federal habeas corpus." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir.

12   1996) (citations omitted).

13       Petitioner does not provide, and the Court has not found, a Supreme Court case requiring

14   a state court to allow post-trial access to jurors' personal identifying information. As there is no

15   clearly established federal law governing this issue, the Court must defer to the state court's

16   decision. See Pha v. Swarthout, 658 F. App'x 849, 850–51 (9th Cir. 2016), cert. denied, 137 S.

17   Ct. 658 (2017) (finding petitioner was not entitled under clearly established federal law to juror

18   contact information and the state court declining to release jurors' addresses and phone numbers

19   was not contrary to, or an unreasonable application of, clearly established federal law).

20   Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

21       2.  Denial of Adequate Defense

22       "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in

23   the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution

24   guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane

25   v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted) (quoting California v. Trombetta, 467

26   U.S. 479, 485 (1984)). That is, "in essence, the right to a fair opportunity to defend *against the*

27   *State's accusations*." Chambers v. Mississippi, 410 U.S. 284, 294 (1973) (emphasis added).

28   Supreme Court precedents "establish, at a minimum, that criminal defendants have the right to

the government's assistance in compelling the attendance of favorable witnesses *at trial* and the right *to put before a jury evidence* that might influence the determination of guilt." <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 56 (1987) (emphasis added).

As noted by Respondent, "it was not that Petitioner was denied the opportunity to present a defense, but he claims that he was denied the opportunity to attack the verdict." (ECF No. 19 at 34). That the trial court limited the disclosure of personal identifying information to two jurors did not deprive Petitioner of a fair opportunity to defend against the government's charges or his right to present evidence and witnesses at trial in his defense. Petitioner has not established a violation of his right to present a complete defense. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

**B. Motion for New Trial**

In his third claim for relief, Petitioner asserts that the trial court abused its discretion in denying his motion for a new trial. (ECF No. 1 at 8; ECF No. 24 at 21). Respondent argues that the state court's reasonable rejection of Petitioner's claim regarding the motion for new trial was not contrary to or an unreasonable application of any clearly established Supreme Court precedent. (ECF No. 19 at 40).

This claim was raised on appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The claim also was raised in the petition for review in the California Supreme Court, which summarily denied the petition. (LDs 32, 33). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

In denying Petitioner's claim regarding the denial of the motion for new trial, the California Court of Appeal stated:

> ***The Decision of How to Resolve Conflicting Evidence Rested with Trial Court***
> As noted above, defendant presented a declaration from the complaining juror in support of the motion for new trial. That declaration set forth several instances of alleged misconduct. The district attorney presented the declaration of the jury foreperson. In that declaration, the jury foreperson denied witnessing any of the misconduct raised by the complaining juror. The court concluded that the

foreperson had addressed and refuted "every single one" of the complaining juror's allegations of misconduct.

Defendant contends that "in trusting and relying upon the statement of the foreperson as the basis for deciding whether to notify the other jurors, the court engaged in a process that was arbitrary and capricious."

Making credibility determinations to resolve conflicts in the evidence is the trial court's job, not ours. " 'The power to judge the credibility of witnesses and to resolve conflicts in the testimony is vested in the trial court....' [Citation.] 'It is an established principle that the credibility of witnesses and the weight to be given their testimony are matters within the *sole* province of the trier of fact....' [Citation.] 'A trier of fact may accept such witnesses as he wishes and reject others.' [Citation.] 'Where there is conflicting testimony, reviewing courts recognize that the trier of the facts has the better opportunity to judge the credibility of witnesses. In such a case the trial court's findings of fact, to the extent that they rest upon an evaluation of credibility, should be regarded as *conclusive* on appeal.' [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463.)

" '[T]he power to judge the credibility of witnesses to resolve conflicts in the testimony is vested in the trial court' [citation] even when the witnesses testify via declarations [citation]." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 499; see also *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711, fn. 3.)

Regardless of the level of our deference to the trial court, there were adequate grounds for crediting the foreperson's version over the complaining juror's. First, there is the general observation that " '[a] single juror who reluctantly joined in a verdict is likely to be sympathetic to the overtures of defeated parties, and to be persuadable to the view that his [or her] own consent rested upon false or impermissible considerations....' " (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 549 superseded by statute on another point as stated in *People v. Wilson* (1996) 43 Cal.App.4th 839, 852.) Moreover, the complaining juror's own version of events suggests her conclusions of intimidation may have been mistaken. The initial e-mail to the trial judge referenced "hostility based ... physical movements ... by other jurors." But the specifics set forth in the declaration paint an unclear picture at best. The declaration recounted that a male juror "threw his backpack and it landed right behind my chair, barely missing me." While the complaining juror "felt this was a direct physical threat," the factual description suggests the event could have been entirely benign. In sum, this is not a situation where the complaining juror's declaration was undisputed and unimpeachably convincing. It was not reversible error to credit the foreperson's declaration over the complaining juror's.[10]

### *The Trial Court's Comments Regarding Jury Foreperson did not Demonstrate Impermissible Prejudging of Evidence*
Defendant contends that the trial court's credibility determination was nonetheless improper because it flowed from an incorrect view of the foreperson's role in deliberations. Specifically, defendant says the court was wrong to say the foreperson was "in charge of the deliberations."

---

[10] Defendant argues the denial of his new trial motion was an "arbitrary deprivation" of a state law entitlement, in violation of his constitutional rights. Because the denial was not erroneous, it was also not an "arbitrary deprivation" of a state law entitlement.

This argument presents two issues: (1) whether the trial court's comment about the foreperson's role was incorrect and (2) whether the trial court's comment (accurate or not) demonstrated a prejudgment that the foreperson's version of events would certainly be more credible than the complaining juror's.

Defendant argues that the court's comment was wrong as a matter of law because a foreperson's "only statutory task" is to advise the court or clerk whether the jurors have agreed upon their verdict. (See § 1149.) That may be the foreperson's only *statutory* task. (See *People v. Perez* (1989) 212 Cal.App.3d 395, 402). However, the foreperson's special role in facilitating deliberations, even if nonstatutory, has long been recognized. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 730; see also CALCRIM 3550 ["The foreperson should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard"].)

In *People v. Ledesma, supra,* 39 Cal.4th 641, the trial court told the jury that the foreperson had been allowed to take jury instructions home, " 'but that is because of her status as foreperson....' " (*Id.* at p. 730.) The trial court said the foreperson " 'has a need to be perhaps better informed than anyone else as to where [certain] instructions are located within [the jury instruction] packet.' " (*Ibid.*) The Supreme Court found no error in the trial court's statements, which "merely explained that the foreperson should be in a position to assist deliberations...." (*Ibid.*)

Thus, it is clear that jury forepersons play a special role in facilitating deliberations. But even if it were a slight overstatement to say that the foreperson is "in charge" of deliberations, the court's comments certainly do not convey the meaning defendant ascribes. Defendant contends the court's description of the foreperson's role shows that the court "assumed" that "the foreperson was a trusted and competent witness to everything that transpired during deliberations, almost as if the foreperson was a proxy for the court." Quite simply, that is not what the court said. The court indicated that if the foreperson corroborates the complaining juror's account, then "we can take it from there. And that may very well involve just sending out notices to everybody...." Notably, the court did not say that if the foreperson contradicted the complaining juror, it would automatically credit the foreperson's account because forepersons are always more credible than other jurors.

Absent compelling evidence, we will not lightly conclude a trial court impermissibly prejudged the weight of evidence before it was presented. Defendant fails to show that is what occurred here. Granted, when the competing declarations were ultimately presented, the court did choose to rely on the foreperson's declaration over the complaining juror's. But there is no evidence that reliance was improper. We assume the court's credibility determination was based on permissible factors rather than a categorical preference for the testimony of forepersons over other jurors.

Defendant also contends it was erroneous for the court to assume that "the foreperson observed everything that went on during deliberations." But here there was evidence the foreperson *was* present during the relevant events. The complaining juror's declaration recounted the alleged misconduct and then said: "I thought the foreperson was responsible for the [deliberations], I remember this as part of what the judge instructed. Therefore, I assumed if there were any problems, such as this sort of threatening behavior, the foreperson would inform the judge." This statement suggests that the complaining juror knew or had reason

to believe the foreperson was aware of the alleged misconduct. Otherwise, the complaining juror would not have assumed the foreperson would inform the judge of such misconduct. Moreover, the trial court may have reasonably inferred that the foreperson was likely to have been aware of misconduct, had it occurred, because of his or her special role in assisting the deliberations.

Finally, defendant argues that the trial court, at a minimum, should have ordered an evidentiary hearing to resolve the conflicts in the two declarations. Defendant relies on *People v. Hedgecock* (1990) 51 Cal.3d 395 in making this contention. But *Hedgecock* is clear that defendants are "not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Id.* at p. 415.) Here, the court considered an evidentiary hearing but ultimately determined it could and would make a ruling based on the competing declarations. Thus, the court necessarily determined, in its discretion, that an evidentiary hearing was *not* necessary to resolve the material, disputed issues of fact. Under *Hedgecock,* it was free to exercise its discretion in this manner. (See *ibid.*)

## CONCLUSION

Of course, we do not know with certainty what happened during deliberations. In these situations, the truth is "hard to ascertain." (*People v. Rhodes, supra,* 212 Cal.App.3d at p. 549.) Our role as a reviewing court is not to detail the events that occurred during deliberations with certitude. Rather, our task is to determine whether the trial court's rulings constitute an abuse of discretion. They do not.

Cabrera II, 2014 WL 3738660, at *7–9 (footnote in original).

1. No-Impeachment Rule

"A general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations. This principle, itself centuries old, is often referred to as the no-impeachment rule." Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 861 (2017). The no-impeachment rule is embodied in Federal Rule of Evidence 606, which provides in pertinent part:

> (1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

> (2) Exceptions. A juror may testify about whether:

> > (A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b). As reflected in Rule 606(b)(2), "[e]xceptions to the common-law [no-impeachment] rule were recognized only in situations in which an 'extraneous influence,' was alleged to have affected the jury." Tanner v. United States, 483 U.S. 107, 117 (1987) (quoting Mattox v. United States, 146 U.S. 140, 149 (1892)). Rule 606 applies in federal habeas cases. See Estrada v. Scribner, 512 F.3d 1227 (9th Cir. 2008) (applying Rule 606 in federal habeas case governed by AEDPA).

### 2. Motion for New Trial

Petitioner argues that the trial court erred when it when it denied his motion for a new trial, which was based on a juror's post-verdict email to the trial judge stating that she was pressured to vote guilty by the other jurors and that she was not thinking clearly due to personal issues. (CT 259). The complaining juror's subsequent affidavit stated in pertinent part:

> One frightening incident concerned a male juror who was clearly upset with me. I could tell this by his demeanor and the loud sighing noises he made as he paced back and forth. At one point he suddenly he [*sic*] threw his backpack and it landed right behind my chair, barely missing me. I felt this was a direct physical threat.

> The foreperson told me that I could speak and then the rest of the jurors could tell me why I was wrong. The foreperson said, "This [deliberations] needs to end now!"

> When I suggested we discuss and consider Dr. Shomer's testimony I told that that [*sic*] I was a "defense whore!" The juror who made that statement did so in a loud and angry voice. I came to fear riding in the elevator with the other jurors, so I took the stairs.

> . . .

> I gave in and voted with the others, fearing what would happen to me of what [*sic*] emotionally and physically if I did not.

(Corr. CT 76–77). The jury foreperson also submitted an affidavit, which stated in pertinent part:

> During the whole trial, including all deliberations, I never witnessed any activity or heard any statements that were inappropriate. If I had, I would have informed the Court.

> I never witnessed any physical or verbal threats among any of the

> jurors, nor did I observe any conduct that could be perceived as a threat to any person. If I had, I would have informed the Court.
>
> I never observed any throwing of any objects, and certainly never observed anything being thrown in order to intimidate another juror. If I had, I would have informed the Court.
>
> At no time during deliberations did I try to bring the deliberations to a close early, nor did I use any intimidation to bring them to a close. Also, did I, or to my knowledge, any other juror force anybody into any decision.

(Corr. CT 93).

The complaining juror's email and the affidavits of the complaining juror and jury foreperson do not concern extraneous prejudicial information or an outside influence. Rather, they set forth statements made and incidents that occurred during the jury's deliberations, the effect of fellow jurors' actions on the complaining juror's vote, and the complaining juror's mental processes concerning the verdict. Such information is inadmissible under the no-impeachment rule. Fed. R. Evid. 606(b). As this Court cannot consider such evidence, Petitioner's juror misconduct allegation is not supported by any competent evidence. Therefore, Petitioner has not established that any alleged juror "misconduct has prejudiced [Petitioner] to the extent that he has not received a fair trial." Anderson v. Calderon, 232 F.3d 1053, 1098 (9th Cir. 2000) (internal quotation mark omitted) (quoting United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974)), overruled on other grounds by Osband v. Woodford, 290 F.3d 1036, 1043 (9th Cir. 2002). Accordingly, Petitioner is not entitled to habeas relief on the ground that the trial court erroneously denied Petitioner's motion for new trial based on juror misconduct.

3. Evidentiary Hearing

To the extent the petition can be construed to assert that the trial court erred in declining to hold an evidentiary hearing, the Court finds that Petitioner is not entitled to habeas relief. Supreme Court precedent does not mandate an evidentiary hearing "*every* time there is an allegation of jury misconduct or bias." Tracey v. Palmateer, 341 F.3d 1037, 1044 (9th Cir. 2003) (quoting United States v. Angulo, 4 F.3d 843, 847 (9th Cir. 1993)). In Remmer v. United States, 347 U.S. 227 (1954), a third party contacted a juror and communicated that the juror could profit by rendering a favorable defense verdict. 347 U.S. at 228. The juror reported the incident to the

trial judge, who discussed it with the prosecutors but not the defense. The trial judge and

prosecutors concluded that the statement was made in jest after the Federal Bureau of

Investigation investigated the incident and issued a report. After the jury returned its verdict, the

defense learned of the incident and filed a motion for a new trial, which was denied without a

hearing. Id. at 228–29. The Supreme Court reversed, finding that the "trial court should not

decide and take final action *ex parte* on information such as was received in this case, but should

determine the circumstances, the impact thereof upon the juror, and whether or not it was

prejudicial, in a hearing with all interested parties permitted to participate." Id. at 229–30.

In Smith v. Phillips, 455 U.S. 209 (1982), a juror applied for an investigator position in

the state prosecutor's office during the trial. 455 U.S. at 212. The prosecutors, who knew of the

juror's application, decided not to inform the trial court or the defense until after the jury

returned its verdict. The trial court denied the defendant's motion to vacate his conviction after

holding a hearing in which the juror and prosecutors testified. The Supreme Court reversed the

lower federal court's grant of habeas relief, finding that the trial court's hearing was sufficient to

comply with due process. Id. at 212–14, 217–18.

The Ninth Circuit has "interpreted Smith and Remmer as providing a flexible rule."

Tracey, 341 F.3d at 1044. "Remmer's command that hearings are warranted in *every* case is

unique to the tampering context," and "Smith leaves open the door as to whether a hearing is

always required and what else may be 'sufficient' to alleviate any due process concerns." Id. See

Godoy v. Spearman, 861 F.3d 956, 962, 966 (9th Cir. 2017) (en banc) (holding Remmer requires

a hearing when there is presumptively prejudicial improper contact between a juror *and an*

*outside party* yet the government does not prove harmlessness and the prejudicial effect of the

communications is unclear from the existing record).

Unlike Remmer, which concerned improper contact between a juror and outside parties,

and Smith, which concerned potential juror bias, the instant case concerns events that occurred

between the jurors inside the jury room during deliberations. "[L]ong-recognized and very

substantial concerns support the protection of jury deliberations from intrusive inquiry," and the

Supreme "Court's holdings requiring an evidentiary hearing where *extrinsic* influence or

relationships have tainted the deliberations do not detract from, but rather harmonize with, the weighty government interest in insulating the jury's deliberative process." Tanner, 483 U.S. at 127, 120 (emphasis added). In Tanner, the Supreme Court held that the district court did not err in declining to hold an additional evidentiary hearing concerning allegations that the jurors were intoxicated during trial (an "internal" matter) given the inadmissibility of juror testimony and the insufficiency of nonjuror evidence. 483 U.S. at 127.

Based on the foregoing, the Court finds that the state court's denial of an evidentiary hearing regarding the alleged intimidation of the complaining juror by fellow jurors was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on the ground that the trial court declined to hold an evidentiary hearing on the juror misconduct.

### C. Ineffective Assistance of Counsel

In his fourth claim for relief, Petitioner asserts that trial counsel was ineffective for calling witnesses that jeopardized the defense. (ECF No. 1 at 10). Respondent argues that the state court's reasonable rejection of the ineffective assistance of counsel claim was not contrary to or an unreasonable application of any right clearly established by the Supreme Court. (ECF No. 19 at 41).

The ineffective assistance of counsel claim was raised on appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The claim also was raised in the petition for review in the California Supreme Court, which summarily denied the petition. (LDs 13, 14). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

Appellant contends defense counsel rendered ineffective assistance by calling Elvia "Evie" Gomez as a defense witness.

He argues:

> "Defense counsel's duty to her [*sic*] client includes the duty to call witnesses that support the client's case. There is a concomitant duty *not* to call harmful witnesses. Defense counsel harmed her [*sic*] client's case by turning over Elvia Gomez's statement to the prosecution and calling Gomez as a witness. The defense investigator's report stated that Ms. Gomez said Cabrera was wearing a dark hooded sweater. [Citations.] Thus, counsel was aware that the witness placed Mr. Cabrera in the same distinctive clothing worn by the robber close in time to the actual robbery.

> "Ms. Gomez's testimony had no value to the case at all, which was apparent from the defense investigator's report. Gomez's account of the time line varied from the consistent account given by Rosalinda Rivera. Ms. Gomez told the defense investigator that they picked her up at 5:00 p.m., and that they left the party at 11:00 and got to Ms. Rivera's place at 11:30 p.m. [Citations.] This time frame is inconsistent with the cell phone records which indicate a call initiated at 11:22 p.m. [Citation.] Defense counsel should have seen this discrepancy prior to trial, should not have released Gomez's report to the prosecutor, and should not have called Gomez to testify."

The right to counsel protects the due process right to a fair trial not only by guaranteeing "access to counsel's skill and knowledge" but also by implementing the constitutional entitlement to an " 'ample opportunity to meet the case of the prosecution.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 684–686 (*Strickland*).) To establish ineffective assistance, the defendant must show that counsel's performance "fell below an objective standard of reasonableness" and prejudiced the defense. (*Id.* at pp. 687–692; see also *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217 (*Ledesma*); *People v. Williams* (1997) 16 Cal.4th 153, 214–215.) To establish prejudice, the defendant must make a showing "sufficient to undermine confidence in the outcome" of a "reasonable probability" that but for counsel's performance "the result of the proceeding would have been different." (*Strickland, supra,* at pp. 693–694; *Ledesma, supra,* at pp. 217–218.) A reviewing court can adjudicate an ineffective assistance claim solely on the issue of prejudice without evaluating counsel's performance. (*Strickland, supra,* at p. 697.)

Ineffective assistance analysis is highly case specific, because attorney errors come " ' "in an infinite variety...." ' " (*In re Resendiz* (2001) 25 Cal.4th 230, 243, quoting *Strickland, supra,* 466 U.S. at p. 693, and disapproved on another point in *Padilla v. Kentucky* (2010) 559 U.S. 356, 130 S .Ct. 1473, 1484.) Accordingly, in every case " 'the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.' " (*In re Resendiz, supra,* 25 Cal.4th at p. 243, quoting *Strickland, supra,* at p. 688.) In California, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation]." (*Strickland, supra,* 466 U.S. at p. 689; *People v. Lucas* (1995) 12 Cal.4th 415, 436–437.)

Elvia "Evie" Gomez testified she, Rosalinda Rivera, Rivera's young son, and appellant were at a child's birthday party on the evening of the attempted robbery and shooting. Gomez and Rivera both testified for the defense. Both women confirmed they were with appellant on the evening of October 20, 2007, and both testified that appellant was on his cell phone when he left them that evening. Appellant's cell phone records showed a call commencing at 11:22 p.m. and lasting 73 minutes. As noted above, defense investigator Albert Custodio testified he interviewed Elvia "Evie" Gomez on December 6, 2007. Gomez said appellant was wearing black shoes, black pants, a blue shirt, and a dark-colored hooded sweater on the evening of October 20, 2007. However, during trial Gomez testified she did not remember what appellant, Rivera, or she herself wore on the evening of the offenses. Nevertheless, defense counsel showed her a zippered, blue, hoodless sweatshirt at trial. Fresno Police Identification Technician Spring Wilson had identified the sweatshirt as a garment appellant wore at the time of arrest. Gomez said the blue sweatshirt looked like the sweatshirt appellant wore on the evening they were together although she could not remember.

Defense counsel's decision to call Gomez as a defense witness did not amount to ineffective assistance as she corroborated the testimony of Rosalinda Rivera and confirmed appellant's whereabouts at the time of the offense. The fact that she offered equivocal statements about the nature of appellant's apparel did not undermine the defense. Even if we assume that calling Gomez to testify amounted to ineffectiveness, appellant cannot demonstrate prejudice. Jorge Rodriguez, the victim, and Belen Melendrez, his girlfriend and coworker, both identified appellant as the man with the gun who shot Rodriguez. Defense counsel would not have lessened the impact of this adverse testimony by declining to call Gomez as a defense witness.

Defense counsel did not render ineffective assistance at trial.

Cabrera I, 2011 WL 1782088, at *9–10.

1. Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693).

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). When this "doubly deferential" judicial review applies, the appropriate inquiry is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

2. Analysis

Even assuming trial counsel's performance was deficient, Petitioner has not established that there is "a reasonable probability that . . . the result of the proceeding would have been different" if counsel had not called Ms. Gomez as a defense witness. Strickland, 466 U.S. at 694. Jorge Rodriguez and Belen Melendez both identified Petitioner as the man who shot Mr. Rodriguez. Even if Ms. Gomez was not called as a witness and did not testify that at or around the time of the offense Petitioner wore clothing similar to that worn by the robber, Petitioner has not shown how the absence of Ms. Gomez's testimony would have undermined Rodriguez and Melendez's identifications such that there is a substantial likelihood of a different result. See

Richter, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").

Under the "doubly deferential" AEDPA review of ineffective assistance of counsel claims, the California Court of Appeal's denial was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

### D. Instructional Error

In his fifth claim for relief, Petitioner asserts that his right to a fair trial was violated by the trial court's erroneous and coercive reasonable doubt jury instruction. (ECF No. 1 at 12). Respondent argues that the state court's reasonable rejection of the instructional error claim was not contrary to or an unreasonable application of any right clearly established by the Supreme Court. (ECF No. 19 at 47).

The instructional error claim was raised on appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The claim also was raised in the petition for review in the California Supreme Court, which summarily denied the petition. (LDs 13, 14). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's instructional error claim, the California Court of Appeal stated:

> Appellant contends the trial court misinstructed the jury on the concept of reasonable doubt and thereby (a) committed reversible error in violation of the Fifth and Fourteenth Amendments to the United States Constitution and (b) engaged in coercion of the jury.[11] Appellant specifically argues the trial court violated the Constitution and coerced the jurors when it advised that "proof beyond a reasonable doubt is proof that leaves you *individually and then unanimously as a collective mind* in an abiding conviction that the charge is true."

---

[11] Appellant addresses these matters as two separate issues in his opening brief on appeal. Because these points rest on the same procedural history, we will treat them as subpoints of the same issue on appeal.

## A. *Procedural History*

During deliberations, the jurors asked for the opportunity to directly address the court. The jury foreperson advised the judge that the jury needed "some guidance." Upon questioning the foreperson, the court learned the jury had taken four "ballots," that there had been some "movement in the count," but that the jurors were unable to reach a unanimous verdict. The court asked whether it could provide some further instruction that might assist the jurors in their deliberations. The foreperson responded, "The definition of reasonable doubt ... a couple of jurors are having a little difficulty understanding that exactly." The court replied:

> "Well, the first thing I'm going to do is point out that there is no numerical quantification that you can attach to that concept, okay. It is a decision that each of you must reach individually and then agree upon unanimously. So, essentially, it begins as an individual decision-making process and it something that experts and lawyers and judges have tried to phrase throughout the course of time in our legal system. And the language that is provided in the instruction is essentially the best version that all of the collective wisdom in our system of jurisprudence can offer.

> "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. It need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.

> "Now, unless you're satisfied that the evidence that was received throughout the entire trial proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty. Once again, proof beyond a reasonable doubt is proof that leaves you individually and then unanimously as a collective mind in an abiding conviction that the charge is true.

> "It's nothing that I can give you a formula for, but in order to reach a decision on the case you must be satisfied individually and then all agree that with an abiding conviction you are satisfied proof beyond a reasonable doubt has been established."

## B. *Alleged Misinstruction*

Appellant argues the trial court misstated reasonable doubt when it referred to the jurors agreeing "unanimously as a collective mind in an abiding conviction that the charge is true." He contends:

> "It suggested that jurors were to give up their view that the case had not been proven beyond a reasonable doubt and compromise as they functioned as a 'collective mind.' The comment that 'it beings as an individual decisionmaking process' suggests that the requirement that each juror be individually satisfied with their decision ultimately gives way to the 'collective mind.' The court's instructions suggested that an individual juror's views are superseded by the will of the jury as a collective unit. This is contrary to law. While jurors are required to deliberate, they are

not required to bend to the will of the majority of jurors. Jury deliberation is a way to help each juror make up their individual mind."

In considering whether the trial court properly instructed the jury on the law governing a case, the appellate court must consider the instructions as a whole, not in isolation. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) The court assumes that jurors are intelligent persons capable of understanding and correlating all of the instructions that they are given. (*People v. Ayers* (2005) 125 Cal.App.4th 988, 997.)

In the instant case, appellant characterizes a single phrase uttered by the court—"unanimously as a collective mind"—as a misdescription of the reasonable doubt standard. He maintains the court committed reversible error per se. However, a careful consideration of the trial court's entire response to the jury belies appellant's contention. Although the court did briefly utter the challenged phrase, the court went on to reinstruct the jury in CALCRIM No. 220. In concluding his remarks, the court observed: "I will do my very best to try to offer any instructional clarifications I can, but again what you have in writing is essentially the best efforts that our system has produced in terms of trying to guide you in your deliberative process." CALCRIM No. 3550, as previously read to the jury, stated in pertinent part: "Each of you must decide the case for yourself, but only after you have discussed the evidence with your fellow jurors.... Your verdict on the sole count of the Information and any special findings contained therein must be unanimous. This means that to return a verdict or make a special finding all of you must agree to it."

The trial court's comments to the jury reflected the law embodied in CALCRIM No. 3550, i.e., that each juror must decide the case for himself or herself after discussion with fellow jurors and that any verdict or special findings must rendered on a unanimous basis. The trial court's brief mention of "unanimously as a collective mind" did not comprise a reversible misstatement of the law of reasonable when considered in light of the entirety of the jury instructions and the court's comments in response to the jury's questions. Reversible error did not occur.

**C. *Alleged Coercion***

Appellant also submits the court's phrase "unanimously as a collective mind" urged the jury to compromise in order to arrive at a verdict, thus constituting prejudicial error per se.

Appellant's contention is misplaced. The phrase, by itself, did not expressly or implicitly displace the jury's independent judgment or suggest that jurors engage in compromise and expediency during their deliberations. If anything, the court's isolated comment was nothing more than a shorthand reference to CALCRIM No. 3550, which states: "Your verdict on the sole count of the Information and any special findings contained therein must be unanimous. This means that to return a verdict or make a special finding all of you must agree to it."

When a jury reaches an impasse in deliberations, a trial court must exercise great care when ordering further deliberations. The court may order the jurors to continue their deliberations and provide them with instructional guidance. However, the court must exercise its power without displacing the jury's independent judgment in favor of considerations of compromise and expediency. The question of coercion is dependent upon the facts and circumstances each

case. (*People v. Sandoval* (1992) 4 Cal.4th 155, 195–196, citing *People v. Breaux* (1991) 1 Cal.4th 281, 319.)

> To determine whether an instruction is coercive, a reviewing court must consider whether it imposes such pressure on jurors to reach a verdict that the appellate court is uncertain of the accuracy and integrity of the jury's stated conclusion. This requires an assessment of the potential effect of a given instruction on the fact-finding process rather than an inquiry into the volitional quality of a specific jury verdict. (*People v. Gainer* (1977) 19 Cal.3d 835, 849–850.)

The trial court's comments and multiple readings of CALCRIM No. 220 did not encourage jurors to abandon their truly held beliefs and did not constitute coercion. No instructional error occurred.

Cabrera I, 2011 WL 1782088, at *21–23 (footnote in original).

1.  Reasonable Doubt

The Due Process Clause requires the government to prove every element of a charged offense beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364 (1970). Regarding the reasonable doubt standard and jury instructions, the Supreme Court has stated:

> [T]he Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury."

Victor v. Nebraska, 511 U.S. 1, 5 (1994) (citations omitted) (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). "The constitutional question . . . therefore, is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard." Victor, 511 U.S. at 6.

In the instant case, Petitioner challenges the trial judge's use of the language "unanimously as a collective mind in an abiding conviction that the charge is true" in defining reasonable doubt. (ECF No. 1 at 50). The trial judge made the challenged statement when the jury foreman indicated that further instruction of reasonable doubt might assist the jury in their deliberations. In response, the trial court stated:

> Well, the first thing I'm going to do is point out that there is no numerical quantification that you can attach to that concept, okay. It is a decision that each of you must reach individually and then

agree upon unanimously. So, essentially, it begins as an individual decision-making process and it something that experts and lawyers and judges have tried to phrase throughout the course of time in our legal system. And the language that is provided in the instruction is essentially the best version that all of the collective wisdom in our system of jurisprudence can offer.

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. It need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.

Now, unless you're satisfied that the evidence that was received throughout the entire trial proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty. Once again, proof beyond a reasonable doubt is proof that leaves you individually and then unanimously as a collective mind in an abiding conviction that the charge is true.

It's nothing that I can give you a formula for, but in order to reach a decision on the case you must be satisfied individually and then all agree that with an abiding conviction you are satisfied proof beyond a reasonable doubt has been established. I can't quantify it for you, okay.

. . . I will do my very best to try to offer any instructional clarifications I can, but again what you have in writing is essentially the best efforts that our system has produced in terms of trying to guide you in your deliberative process.

(5 RT 710–12).

"It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The challenged language appears in the following sentence, which reads in its entirety: "Once again, proof beyond a reasonable doubt is proof that leaves you *individually and then* unanimously as a collective mind in an abiding conviction that the charge is true." (5 RT 711) (emphasis added). In the same sentence, the trial court indicates that jurors must come to a conclusion individually first and then "unanimously as a collective mind." This was repeated during the trial judge's oral instruction. He stated that "[i]t is a decision that each of you must reach individually and then agree upon unanimously," "essentially, it begins as an individual decision-making process," and

34

"in order to reach a decision on the case you must be satisfied individually and then all agree." (5 RT 710–11).

Additionally, the trial judge advised the jury to look at the written jury instructions, which the judge described as "essentially the best version that all of the collective wisdom in our system of jurisprudence can offer" and "essentially the best efforts that our system has produced in terms of trying to guide you in your deliberative process." (5 RT 710, 712). The written instructions stated in pertinent part:

> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.
>
> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
>
> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

(CT 176).

In light of the written instruction, the trial judge's emphasis that the written instruction is the best definition of reasonable doubt, and that in context the trial judge's additional oral instruction indicated that the jurors must come to a conclusion individually first and then agree unanimously, there is not a reasonable likelihood that the jury understood the trial court's instructions to allow conviction based on proof insufficient to satisfy the beyond a reasonable doubt standard. Thus, the California Court of Appeal's denial of the instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law,[12] nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification

---

[12] Although the California Court of Appeal did not cite to any United States Supreme Court authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker v. Small, 665 F.3d 1143, 1148 n.1 (9th Cir. 2011) (citing Early v. Packer, 537 U.S. 3, 8 (2002)). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on the ground that the trial court gave erroneous reasonable doubt instructions.

2. <u>Alleged Coercion</u>

"Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241 (1988). Supplemental charges to encourage a deadlocked jury to try to reach a verdict are not coercive <i>per se</i>. In determining whether the jury was improperly coerced, courts must "consider the supplemental charge given by the trial court 'in its context and under all the circumstances.'" <u>Id.</u> at 237 (quoting <u>Jenkins v. United States</u>, 380 U.S. 445, 446 (1965) (per curiam)).

In <u>Lowenfield</u>, the jury informed the court that they were unable to reach a decision during the second day of sentencing deliberations. 484 U.S. at 234. The court polled the jury regarding whether further deliberations would be helpful in obtaining a verdict by having the jurors write their names on pieces of paper and answering the question. Eleven jurors believed further deliberation would be helpful and one did not. <u>Id.</u> at 234–35. The judge then gave the following supplemental charge:

> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.
>
> Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

<u>Id.</u> at 235. Thirty minutes later, the jury returned with a verdict sentencing the defendant to death. <u>Id.</u> In finding that the instruction was not unconstitutionally coercive, the Supreme Court limited its holding to the facts of the case, but noted that "[b]y so holding we do not mean to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion." <u>Id.</u> at 241.

In <u>Early v. Packer</u>, 537 U.S. 3 (2002) (per curiam), a juror requested that she be dismissed due to health problems after twenty-eight hours of deliberation. The judge met with the juror alone, and the juror explained that she could not "make snap decisions" and was "beginning to feel a little burned out" due to the "seriousness of the charges." The judge asked to juror to "hold out just a little bit longer." The juror agreed, and the judge replied, "I really appreciate it. Otherwise, they have to start deliberations all over again with another person." <u>Id.</u> at 4. The following day, the judge received a note indicating the jury could no longer deliberate and that nearly all the jurors questioned the one juror's ability to reason and understand the rules. <u>Id.</u> The judge read the note aloud to the jury, stated that a juror has "a right to disagree with everybody else," inquired as to the latest vote count (eleven to one), and instructed the jury that they were to apply the law as stated by the court to the facts as the jury found them. <u>Id.</u> at 4–6. During the next day of deliberations, the juror again requested to be dismissed from the jury. The judge met with the juror alone in chambers, and after ascertaining that she continued to deliberate, the judge thanked her and she returned to the jury room. After two more days of deliberations, the jury returned with a guilty verdict. <u>Id.</u> at 6. Applying AEDPA's deferential standard of review, the Supreme Court reversed the grant of habeas relief because the state court's determination that there was no coercion was not contrary to, or an unreasonable application of, clearly established Supreme Court law. <u>Id.</u> at 10–11.

In Petitioner's case, during deliberations the jurors requested to speak with the court directly. (5 RT 708). Before the foreperson spoke, the trial court stated: "[B]efore you say anything and before I ask any questions of you, I just want to caution you not to disclose to me at this time how the voting may be balanced in either direction on the sole count of this Information, okay." (5 RT 708–09). The trial court subsequently engaged in the following colloquy with the foreperson:

> THE COURT: Based on what I'm hearing at this time your jury has been unable to reach an unanimous verdict on Count One; is that correct?
>
> JUROR SEAT NUMBER FOUR: That's correct.
>
> THE COURT: Okay. Now, again, without telling me which way

the vote is leaning at any time, let me ask you, how many ballots have you taken?

JUROR SEAT NUMBER FOUR: We've taken—we've taken four.

THE COURT: Okay. And is there any movement in the count?

JUROR SEAT NUMBER FOUR: Yes, there is.

THE COURT: Okay. Very well.

Now, is there some further instruction on the law that I can provide to you or is there some further testimonial readback that I can provide to you that might assist in your deliberations?

. . .

JUROR SEAT NUMBER FOUR: The definition of reasonable doubt, it—could you please explain that? It's—we're reading it and we're—a couple of jurors are having a little difficulty understanding that exactly. It might sound—they might understand it better if it comes from you, if you explain it.

(5 RT 709–10). The trial court then instructed the jury on reasonable doubt as set forth in section IV(D)(1), *supra*.

The combination of supplemental charge and polling in the instant case does not warrant a different result from Early, in which the Supreme Court held that the state court's determination that the jury was not improperly coerced was neither contrary to nor an unreasonable application of clearly established federal law. Unlike the trial judge in Early who directly inquired about the specific vote count, the trial court in Petitioner's case admonished the foreperson to not disclose the specific vote count. Additionally, although the trial court learned the jury had taken four "ballots" and there had been "movement in the count," the judge did not know the identities of the jurors who had "difficulty understanding" reasonable doubt and did not meet with these jurors individually to encourage further deliberation.

The Court finds that the California Court of Appeal's decision was not contrary to, or an unreasonable application of, clearly established federal law,[13] nor was it based on an unreasonable determination of fact. The California Court of Appeal's decision that the trial

---

[13] Although the California Court of Appeal did not explicitly reference any Supreme Court authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker, 665 F.3d at 1148 (citing Early, 537 U.S. at 8).

38

court's actions were not coercive is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

## V.

## RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**August 7, 2018**__               /s/ _Erica P. Grosjean_
                                          UNITED STATES MAGISTRATE JUDGE